766 So.2d 521 (2000)
ENTERGY GULF STATES, INC.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 00-CA-0336.
Supreme Court of Louisiana.
August 31, 2000.
Rehearing Denied October 13, 2000.
*523 J. Wayne Anderson, Margot Gallup Augustin, Kathryn J. Lichtenberg, Matthew Robert Suffern, Jason Matthew Bilbe, Noel Joseph Darce, Michael R. Fontham, New Orleans, Eve Kahao Gonzalez, Katherine Wright King, Baton Rouge, John Christopher Neel, Stephanie De Sales Shuler, New Orleans, Counsel for Appellants.
KIMBALL, Justice.[*]
Both the Louisiana Public Service Commission ("Commission") and Entergy Gulf States, Inc. ("Company") have appealed portions of the district court's ruling regarding the Commission's Order No. 22092-B which, based upon the 1995 test year, provides for a refund of $44.8 million and a prospective rate reduction of more than $54 million. Three issues relating to this Order have been appealed to this court pursuant to La. Const. Art. IV, § 21(E): (1) the district court's conclusion that costs disallowed as imprudent, excessive or unreasonable should be treated as "savings" in the savings tracker calculation, (2) the district court's determination that the Commission failed to specify the rate of return on common equity, and (3) the district court's finding that the Commission was not arbitrary and capricious in refusing to permit the Company to weather normalize its test year revenues. After a thorough review of the record, briefs, and relevant authorities, we conclude that the Commission's determinations that the savings tracker mechanism shall not be interpreted to include recovery of any portion of disallowed imprudent, unreasonable or excessive expenditures and that the Company will not be allowed a weather normalization adjustment in its test year revenues are adequately supported by the record, but that the Commission erroneously failed to specify the rate of return on common equity the Company is allowed to earn. The judgment of the district court is therefore affirmed in part and reversed in part and the matter is remanded to the Commission for further proceedings.

Facts and Procedural History
In 1993, by Order No. U-19904 ("Merger Order"), the Commission approved, subject to certain conditions, the merger of Entergy Corporation ("Entergy") and Gulf States Utilities Company ("Gulf Sates"). In the Merger Order, the Commission concluded the merger was in the public interest because it provided "a unique opportunity to achieve economies through greater coordination and sharing of resources between utilities that are interconnected and well situated to provide mutual benefits." L.P.S.C. Order No. U-19904 at 54. Specifically, the Commission found the merger would permit a more efficient use of resources and would produce fuel savings as well as nonfuel operation and maintenance ("O & M") savings. These cost reductions could then be passed on to ratepayers and investors.
To provide Entergy with an opportunity to recover the premium it paid to acquire Gulf States, the parties agreed to a plan in which the actual savings achieved by the Company over an eight-year period are calculated using a savings tracker mechanism. This savings tracker mechanism is described in the Joint Regulatory Proposal ("Proposal"), an appendix to the Merger Order. It calculates O & M savings actually achieved through the application of a *524 formula that compares normalized base year expense levels with normalized future year expense levels. When O & M savings are produced in a year, sixty percent of those savings allocable to Louisiana retail operations are treated as a legitimate and prudent expense and included in any Louisiana jurisdictional revenue requirement based upon that year as a test year. The remaining forty percent of the O & M savings are passed through to ratepayers via a rate reduction.
To ensure compliance with this agreement, the Proposal outlines an annual earnings review procedure for the eight-year period. Each year following the initial filing based on the pre-merger test year of 1993, the Company must file, within five months after the end of the post-merger calendar year, a Louisiana jurisdictional revenue requirement analysis based on data for that year. The Commission reviews each filing, makes appropriate adjustments, and issues a rate order. The Proposal requires that the following principles apply to the annual savings and rate review:
a) The cost of equity will be reviewed no less frequently than every other year. Any party can request a change in the approved cost of equity in any annual review. All other cost of capital components will be reviewed annually;
b) The Company will not be allowed to defer O & M expense for the purpose of computing savings under the [O & M savings tracker] mechanism ...;
c) The Commission shall retain the right to review the accounting practices of the Company to ensure that they are consistent with [Generally Accepted Accounting Principles] and sound regulatory principles and practices; and
d) The Commission shall retain the right to review the prudence of capital expenditures consistent with traditional regulatory principles.
Appendix 1 to L.P.S.C. Order No. U-19904, Joint Regulatory Proposal Term Sheet, at 6.[1]
The order on appeal, Order No. U-22092-B, is the rate order issued by the Commission following the third annual review of the Company's earnings and represents the first time the Company achieved savings to be included in the cost of service through the use of the savings tracker mechanism.
The Company filed its annual revenue requirement for the 1995 test year on May 31, 1996. The Company's revenue requirement calculation indicated that a $5.259 million rate reduction was appropriate and it implemented that reduction effective June 1, 1996. Hearings were conducted before Administrative Law Judge Carolyn L. DeVitis, who issued her Proposed Recommendation on May 22, 1998. The Company and the Commission Staff both filed exceptions to the Proposed Recommendation. A Final Recommendation was issued by Judge DeVitis on August 7, 1998.
At its August 19, 1998 Open Session, the Commission generally adopted the ALJ's final recommendation, rejecting only the recommendation relating to a weather normalization adjustment. Commission Order No. U-22092-B was issued on September 10, 1998 and provides for a refund of $44.8 million and a prospective rate reduction of $54.6 million. The Order also rejected the weather normalization adjustment requested by the Company, set the Company's rate of return on equity and concluded that the O & M savings tracker shall not be interpreted to include recovery of any portion of disallowed imprudent, unreasonable or excessive expenditures.
The Company appealed portions of the Order to the Nineteenth Judicial District Court. The trial court affirmed the Commission's *525 decision to reject the Company's request for a weather normalization adjustment, finding this decision was clearly within its discretion and sufficiently based on the testimony and evidence before it. The trial court, however, reversed that part of the Commission's Order dealing with the inclusion of disallowed costs in the O & M Savings Tracker calculation and the failure of the Commission to set forth a specific allowed rate of return on common equity.[2] The court found that there was no evidence in the record, other than the argument of special counsel, upon which the Commission could have based its decision that the savings tracker should not be interpreted to include recovery of disallowed imprudent, unreasonable or excessive expenditures. Thus, it found the Commission's ruling on this issue was clearly unsupported by the record and "must be reversed." Regarding the rate of return on common equity, the court found that in the absence of the Commission's presentation of any evidence of a "traditional" assignment of the mid-point of the designated range, its failure to designate a specified allowable rate of return on common equity constituted an arbitrary and capricious act. The court reversed the Commission on this issue and directed that, on remand, the Commission set forth a specific allowed rate of return on common equity.
Both the Commission and the Company appealed portions of the district court's judgment to this court pursuant to La. Const. Art. IV, § 21(E). Because of the district court's grant of a preliminary injunction, which was unopposed by the Commission, implementation and enforcement of Order No. U-22092-B were enjoined pending a final judgment by this court.
The Commission raises two assignments of error on appeal to this court: (1) the district court erred in concluding that costs disallowed as imprudent, excessive or unreasonable should be treated as "savings" in the savings tracker calculation, and (2) the district court erred in determining that the Commission failed to specify the rate of return on common equity. The Company asserts as error the district court's finding that the Commission was not arbitrary and capricious in refusing to permit the Company to weather normalize its test year revenues.[3]
The law applicable to judicial review of orders of the Commission is well-settled. This court has repeatedly stated:
Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record.
Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-1235, p. 6 (La.4/16/99), 730 So.2d 890, 897; Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-0881, p. 4 (La.1/20/99), 726 So.2d 870, 874; Gulf States Util. Co. v. Louisiana Pub. Serv. Comm'n, 96-0345, p. 2 (La.7/2/96), 676 So.2d 571, 573; Central Louisiana Elec. Co. v. Louisiana Pub. Serv. Comm'n, 508 So.2d 1361, 1364 (La. 1987). This court has further stated:

*526 The Commission is an expert within its own specialized field and its interpretation and application of its own General Orders, as distinguished from legislative statutes and judicial decisions deserve great weight, because the Commission is in the best position to apply its own General Orders.
Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-1235 at p. 6, 730 So.2d at 897 (citing Dixie Elec. Membership Corp. v. Louisiana Pub. Serv. Comm'n, 441 So.2d 1208, 1210 (La.1983)). Therefore, the Commission's interpretation of its own rules and past orders is entitled to the same deference accorded the Commission's orders. Id.; Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-0881 at p. 35, 726 So.2d at 891. In sum, "courts must affirm the Commission's rulings unless they are arbitrary or capricious, an abuse of authority, unsupported by the record, or clearly erroneous." Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-1235 at p. 6, 730 So.2d at 897.

Inclusion of Disallowed Imprudent, Unreasonable or Excessive Expenditures in Savings Tracker
In its first assignment of error, the Commission contends the district court erred in ruling that costs disallowed because they are imprudent, excessive or unreasonable should be treated as "savings" in the savings tracker calculation. The Commission argues the tracker contains no provision for the inclusion of regulatory disallowances as savings and was never intended to permit the recovery of a disallowed imprudent or unreasonable expense as a "legitimate and prudent expense." The Commission further reasons that because of the sixty percent sharing mechanism, treating disallowances as "savings" would allow the Company to recover sixty percent of disallowances and thus pervert the intention underlying the usage of the tracker.
In opposition to the Commission's arguments on this issue, the Company contends that all adjustments that affect the revenue requirement should also be reflected in the savings tracker calculation since all such adjustments produce reductions in costs to ratepayers, which make savings available for recovery of the acquisition premium. The Company further argues that if the Commission removes an amount of expenses from the Company's revenue requirement, then that same amount must be removed from the normalized expenses used to calculate savings. It asserts that the plain language of the Joint Regulatory Proposal contemplates that the O & M expense included in the revenue requirement used in setting rates and the future year normalized O & M expense used in calculating savings under the tracker will be consistent.
The Order states, "The O & M Savings Tracker shall not be interpreted to include recovery of any portion of disallowed imprudent, unreasonable, or excessive expenditures." L.S.P.C. Order No. U-22092-B at 32. The Commission asserts this conclusion is supported by both the plain language of the Merger Order and the testimony of its witness, Mr. Kollen. Keeping in mind the principles that "[t]he Commission is an expert within its own specialized field and courts should be reluctant to substitute their views for those of the expert body charged with the legislative function of ratemaking," Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-1235 at p. 27, 730 So.2d at 911 (internal citations omitted), we find the Commission's conclusion is supported by the plain language of the Proposal and/or the testimony of its witness.
The Proposal describes the way the savings tracker is to operate. Paragraph (4) of the Proposal states:
To measure the savings achieved as a result of the merger, a benchmark will be established. The benchmark will be based on a "normalized" pre-merger test year's operation and maintenance expense, *527 as set forth in Attachment A [Base Year Normalized Operating Expense]. For each year subsequent to the test year, the operation and maintenance expense level will be increased by an inflation factor reflecting the Consumer Price Index and by one-half the amount of the company's growth in sales to residential and commercial customers. To measure savings, future years will be normalized in a manner consistent with the base year, as set forth in Attachment A [Future Year Normalized Operating Expense].
Appendix 1 to L.P.S.C. Order No. U-19904, Joint Regulatory Proposal Term Sheet, at 1-2. To determine the Base Year Normalized O & M expense, Attachment A mandates that the Total Actual 1992 Non-Fuel O & M expense (excluding specific accounts) be quantified, certain expenses and costs be deducted from that amount, and other specific costs and charges be added. The final calculation yields the Total Base Year Normalized, to which the normalized future year expense levels will be compared to measure savings. The Proposal also contains the formula to be used to calculate the Future Year Normalized O & M expense. That formula states that the Total Actual Future Year Non-Fuel O & M Expense (excluding specific accounts) be quantified and, from that number, certain expenses, costs and charges or credits be subtracted.
As we stated in Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-1235 at p. 8, 730 So.2d at 898, "When a Commission order adopts an agreement between a utility and the Commission, this Court cannot unjustifiably disregard the parties' intentions or the plain language of the agreement to uphold the Commission's interpretation of the order, even though the Commission's interpretation of its own orders generally deserves great weight." Likewise, when the agreement between the utility and the Commission is clear, we cannot disregard its plain language to effectuate a modification proposed by the Company when the Commission does not agree to the change. Nowhere does the formula provide for the subtraction of disallowed imprudent, unreasonable, or excessive expenditures. Thus, although the Proposal clearly contemplates a prudence review, stating that the Commission "shall retain the right to review the prudence of capital expenditures consistent with traditional regulatory principles," it does not provide for the removal of disallowed imprudent, unreasonable, or excessive expenditures from the savings tracker. Therefore, we can only conclude that the parties did not agree to the removal of such disallowed expenditures from the savings tracker calculation, and the Commission's determination in this regard is supported by the plain language of the Merger Order.
The Company's argument that the plain language of the Proposal precludes the Commission from making one set of adjustments to the O & M expense in the rate review and another set of adjustments in the savings tracker is without merit. Although the Company correctly points out that "Principle (c)" of the Proposal requires that the amounts reflected in the annual savings and rate reviews be consistent with "GAAP and sound regulatory principles and practices," it misinterprets this requirement. The quoted principle does require that the accounting practices employed in the annual savings and rate review be consistent with GAAP and sound regulatory principles and practices, but the language clearly does not require that adjustments made to the rate review also be made to the savings tracker calculation. Similarly, although the Proposal does state that to measure savings, "future years will be normalized in a manner consistent with the base year, as set forth in Attachment A," there is no requirement that the calculations for the base year normalized and the future year normalized be identical. In fact, the expenses and costs listed in Attachment A as reductions to the total actual 1992 non-fuel O & M expenses are not identical to those listed as reductions *528 to the total actual future year non-fuel O & M expenses.
The Commission's conclusion that the O & M Savings Tracker shall not be interpreted to include recovery of any portion of disallowed imprudent, unreasonable, or excessive expenditures, is also supported by the testimony of its witness, Mr. Kollen. In his direct testimony before the ALJ, Mr. Kollen testified as follows:
Q: Okay. Now you did indicate that there's a category of expense that you would not recommend removing from the future year calculation in the tracker even if it's taken out of the cost of service; is that right?
A: Yes, that's correct.
Q: And what type of expense is that?
A: To the extent that the Commission finds that there is an imprudent, excessive and/or unreasonable level of O & M expense included in revenue requirement and then disallows that from recovery, it's our recommendation that that not be reflected in the future year component of the O & M savings tracker mechanism. And the reason for that is that the company should have the full disallowance. They shouldn't be entitled to an offset to that of 60 percent. If they're found to be imprudent or if it's found that there is an excessive or unreasonable level of costs, then there shouldn't be an ability to undo that through the tracker by 60 percent.
Q: Do you think it would be appropriate for the company to be able to recover, through this tracker mechanism, say 60 percent of an imprudent expenditure?
A: No, I don't.
Q: So, youI take it then that you wouldyou are proposing that that adjustment not be make to the tracker?
A: That's correct.
Dir. Test. Mr. Kollen at 39-40, L.P.S.C. (1/28/97). Upon the Company's cross-examination, Mr. Kollen again explained, "to exclude the expenses, the unreasonable expenses, from the future year under the tracker mechanism would, essentially, give the company a partial recovery of the disallowed cost, and I think that's inappropriate." Cross-Examination Mr. Kollen at 26, L.P.S.C. (1/29/97).[4] Additionally, the Company's witness, Mr. Wright, acknowledged that a regulatory disallowance is not a savings produced by the merger. Cross-Examination Mr. Wright at 84, L.P.S.C. (2/17/97). Although the Company did present witnesses whose testimony conflicted with that of Mr. Kollen, the Commission clearly acted within its discretion in accepting the testimony of Mr. Kollen over that of the Company's witnesses. Thus, the Commission's determination that *529 the savings tracker shall not be interpreted to include recovery of any portion of disallowed imprudent, unreasonable or excessive expenses is adequately supported by the testimony contained in the record.
As explained above, the Commission's order that the savings tracker is not to be interpreted to include recovery of any portion of disallowed imprudent, unreasonable or excessive expenditures is supported by either the plain language of the Merger Order or the testimony of Mr. Kollen. Therefore, the district court's judgment to the contrary is reversed.

Return on Common Equity
In its second, and final, assignment of error, the Commission contends the district court erred in concluding that its failure to designate a specified rate of return on common equity constituted an arbitrary and capricious act. The Commission argues that its intent to set the Company's rate of return at the midpoint of the range specified in the Order is clearly implied and a sentence dictating the use of the midpoint was simply omitted. The Commission points out that the Order refers explicitly to the "midpoint of 10.83%" and states that the return on common equity should be fixed "within" the range of 10.31% to 11.34%. It asserts that it traditionally uses the midpoint of a rate of return range when setting the rate of return on common equity.
The Company, on the other hand, contends the Commission determined only that the rate of return on equity would be set within a range of cost of equity estimates reflecting a range of growth rates between 3% and 4%. The Company claims the record contains no clear implication that the rate of return on common equity was set at the midpoint of the range. The Company also argues that, although the Commission has set a utility's authorized return on equity at the midpoint of the range in some cases, the Commission is not obligated to do so and has, in fact, adopted rates of return on equity that differed from the midpoint of the range of estimates produced by its staff.
With respect to the rate of return on common equity, the "Conclusion" section of the Order states:
EGSI's Rate of Return on equity is to be calculated using the constant growth DCF model. The proxy group of comparable utilities to develop a range of rate of return shall consist of the four companies utilized by both EGSI and Staff, i.e., Boston Edison, General Public Utilities, PECO Energy, and United Illuminating. The rate of return on equity for EGSI shall be set consistent with the range of rates of return on equity for the above group.
Estimating growth can be problematic and no single estimate should be considered indicative of investor expectations. If a growth rate of 3% to 4% is utilized, this produces a range of 10.31% to 11.34%, with a midpoint of 10.83%. The result of Staff's calculation for hearing was a range arrived at by adding the expected dividend yield to the expected growth rate to produce a return in a range of 10.53% to 11.15%, the midpoint of which is 10.84%. Mr. Baudino recommended that a 10.85% Rate of Return be adopted for EGSI. The record is somewhat confusing in that Mr. Baudino in Direct Testimony gives a growth rate range from 3% to 3.7%, while at Hearing Mr. Baudino's growth range was 3.4% to 4%, Staff's Post Hearing Brief uses a 3.4% to 4% growth rate, but Staff's Reply Brief utilizes of [sic] a growth range from 3% to 3.7%. The Administrative Law Judge requested that the parties provide calculations based on a proxy group of the companies that both Staff and EGSI used to arrive at an appropriate rate of return. Staff provided calculations using a 3% and a 3.7% growth rate to produce a range of 10.31% to 11.04%, for a 10.67% average. Staff argued in it[s] Reply Exceptions that the 3% to 3.7% growth range was closer than 3% to 4% to the growth range of *530 the companies utilized. EGSI provided calculations using a 3%, a 3.7%, and a 4% growth rate to produce a rate of return range of 10.31% to 11.34%, with a midpoint of 10.83%. EGSI argued in its Reply Exceptions that it was inappropriate to authorize a rate of return lower than that recommended by Staff. A growth rate which encompasses both ranges would be between 3% and 4% and is hereby adopted.
L.P.S.C. Order No. U-22092-B at 45-46 (internal citations omitted). The Order contains a section entitled "Summary of Conclusions." In that summary, the Order states the following with reference to rate of return on equity: "Estimating growth can be problematic and no single estimate should be considered indicative of investor expectations. A growth rate of 3% to 4% shall be utilized, thus producing a range of rate of returns between 10.31% to 11.34%. EGSI's ROE shall be set within this range, between 10.31% to 11.34%." L.P.S.C. Order No. U-22092-B at 3. As can be seen, the Order does not explicitly adopt a rate of return set at the midpoint of the selected range.
The Commission's reference to a sentence being omitted in its Order and in the ALJ's Final Recommendation is apparently made because the ALJ's Proposed Recommendation clearly stated that the Company's rate of return on equity is to be set at the midpoint of the adopted range:
EGSI's Rate of return on equity is to be calculated using the constant growth DCF model. The proxy group of comparable utilities to develop a range of rate of return shall consist of the four companies utilized by both EGSI and Staff, i.e., Boston Edison, General Public Utilities, PECO Energy, and United Illuminating. The rate of return on equity for EGSI shall be set consistent with the range of rates of return on equity for the above group. A growth rate of 3% to 4% is to be utilized. EGSI's ROE is set at the midpoint of the range.

Draft Order No. U-22092, Proposed Recommendation of Administrative Law Judge Carolyn L. DeVitis, May, 22, 1998, at 63 (emphasis added). The underlined sentence is missing from the Final Recommendation of the ALJ and the Order. The Commission argues the omission was simply an oversight.
In reading the Final Recommendation of the ALJ and the Order at issue, it appears the Commission may be correct in its contention that both the ALJ and the Commission intended that the rate of return on equity be set at the midpoint of the adopted range. This intention, however, was not specified and is not necessarily implied by the record. Additionally, the Commission did not present sufficient evidence to indicate that it commonly adopts the midpoint of a selected range as the allowable rate of return on common equity. In the absence of such specification, necessary implication or evidence, this court will not venture to guess the rate of return on equity the Company is allowed to earn and it will not re-write the Order to include the Commission's alleged intention. See Central Louisiana Elec. Co., Inc. v. Louisiana Pub. Serv. Comm'n, 437 So.2d 278, 279 (La.1983) ("Although we may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, such as when the findings and reasons are necessarily implied by the record, we will not supply a finding from the evidence or a reasoned basis for the Commission's action that the Commission has not found or given."). If the Commission intended to fix the midpoint of the selected range as the allowable rate of return on common equity, it must explicitly state this determination in its Order. Because the Order fails to set a specific rate of return on common equity, the matter is remanded to the Commission for it to determine the specific rate of return on equity the Company shall be permitted to realize. The district court's judgment on this issue, reversing that portion of the Order which sets the range of allowed rate of return on common *531 equity at 10.31% to 11.34%, is therefore affirmed.

Weather Normalization Adjustment
In its assignment of error, the Company argues the district court erred in finding the Commission was not arbitrary and capricious in refusing to allow the Company to weather normalize its test year revenues. According to the Company, the purpose of such an adjustment is to determine the amount of sustainable energy sales within a given test year, excluding those sales resulting from extreme weather conditions, so that rates may be set appropriately. When the abnormal weather data is removed from the test year data, the utility's rates can be set to reflect a level of sales that excludes weather conditions unlikely to reoccur. The Company asserts both Company and Commission staff witnesses employed the same basic statistical model in computing their proposed weather adjustments and the methodology used is generally accepted in the utility industry. The Company avers that despite the weight of the evidence supporting the weather normalization adjustment, the Commission arbitrarily and capriciously ignored the recommendations of its staff, the Company, and the ALJ and refused to allow any such adjustment. The Company also contends that an adjustment for weather-related sales is an appropriate ratemaking adjustment for electric utilities and that the Commission itself has adopted weather normalization adjustments for utilities subject to its jurisdiction.
In response to these arguments, the Commission contends it rejected the Company's request for a weather normalization adjustment because it found that the propriety of the adjustment is questionable in annual earnings cases and the available weather data may not be reliable. The Commission contends that since the Company's rates are reset each year, changes in weather are reflected promptly in the Company's rate and these changes, which are based on actual data, are more accurate than the use of a "normal." The Commission asserts that the weather data used by the Company was generated by weather stations outside the Company's Louisiana retail service territory and could not, therefore, provide an accurate measure of the weather effect on sales for the service area. The Commission also argues that because the "normal" used by the Company to adjust its sales was consistently hotter than the actual reported results, the application of a weather adjustment would require repeated downward adjustments to revenues.
The Company did not request a weather normalization adjustment in either the first or second earnings review. According to the Commission, the Company proposed the weather normalization adjustment in its initial filing, thereby reducing its test year revenues and increasing its revenue requirement by $13.4 million. Had the Company not introduced a weather normalization adjustment in the test year at issue, the Commission contends the Company would have had to decrease its rates not by the $5 million it actually put into effect, but by approximately $18 to $19 million. In implementing this adjustment, the Company based its analysis on weather data from weather stations located outside the Company's service territory. The Commission Staff's consultant, Mr. Baron, testified that if the Commission chooses to allow a weather normalization adjustment, it is inappropriate to use weather data from weather stations outside the service area in calculating a weather normalization adjustment. Additionally, he stated that the data from New Orleans, one of these sources located outside the service area, "was always hotter than normal." Dir. Test. Mr. Baron at 48, L.P.S.C. (1/30/97). Mr. Baron performed his own analysis using weather data from the official weather station in Baton Rouge at Ryan Airport. He testified that he used the data from this station because it was located in the Company's service area and represented the *532 greatest proportion of the Company's customers in Louisiana.
The Company, on the other hand, presented the testimony of Mr. Dillon in which he continued to maintain that the use of the New Orleans data was appropriate because it better approximated the Company's Louisiana service area as a whole. Mr. Dillon and another Company witness, Mr. Grymes, also criticized Mr. Baron's use of data from Baton Rouge-Ryan Airport, contending that the airport's use of the Automated Surface Observation System (ASOS) resulted in an apparent "cooling" effect. While continuing to advocate the use of New Orleans weather data, Mr. Dillon conducted another analysis using data from weather stations located in Baton Rouge, Lake Charles and Lafayette, all within the Company's Louisiana service territory. In the Baton Rouge area, however, Mr. Dillon used data from the Louisiana State University-Ben Hur weather station in lieu of the Baton Rouge-Ryan Airport data utilized by Mr. Baron. According to the Company's witness, the Ben Hur weather data do not contain the "cooling" bias reflected in the Ryan Airport data because the Ben Hur station does not employ ASOS data.
Mr. Baron disputed the Company's use of the Ben Hur data, contending that the Ben Hur data set was missing data for several periods of time and that its available data was consistently hotter than normal. Mr. Baron continued to recommend the use of Baton Rouge-Ryan Airport data because it is the official weather service data and is more evenly dispersed around the normal, even for periods before ASOS was employed. Mr. Baron also criticized the Company's use of Lake Charles data, stating that it also showed that most years were hotter than normal, suggesting either that Lake Charles is either hotter than normal or that something is amiss in its data.
After considering the evidence presented, the ALJ, while recognizing that it is within the Commission's discretion to approve a weather normalization adjustment, found that the Company was not unreasonable in requesting such an adjustment. The ALJ recommended that the adjustment be made in the amount of $5.22 million. The Commission, however, rejected this recommendation, finding that a weather normalization adjustment was inappropriate in the context of annual earnings cases and that the available weather data may not be reliable.[5]
The decision to allow or disallow a weather normalization adjustment lies within the sound discretion of the Commission. See City of Helena v. Montana Dept. of Pub. Serv. Regulation, 194 Mont. 173, 634 P.2d 192 (1981). Here, the Commission had before it conflicting evidence as to the reliability of available weather data. As such, it reasonably acted within its discretion in denying the Company's request for a weather normalization adjustment. The Company's argument that the Commission acted arbitrarily and capriciously in denying its request for the adjustment because the ALJ and its own staff both agreed that such an adjustment is an appropriate ratemaking adjustment for electric utilities is without merit. The general rule is that the Commission may use its own judgment when *533 evaluating evidence relating to a matter within its expertise. Gulf States Util. Co. v. Louisiana Pub. Serv. Comm'n, 96-0345, p. 5 (La.7/2/96), 676 So.2d 571, 575 (citing Baton Rouge Water Works Co. v. Louisiana Pub. Serv. Comm'n, 342 So.2d 609, 611 (La.1977)). In such instances, the Commission is "not bound by even uncontradicted testimony of experts which amount to mere opinions on their part." Id. Similarly, the fact that the Commission has approved such adjustments in other cases does not compel it to adopt these adjustments in every case. As was stated by the Supreme Court of Virginia, "Approval of the general principle of weather normalization and approval of specific weather adjustments in other cases do not mandate approval of such an adjustment in the present case, which must stand or fall on its own record." Roanoke Gas Co. v. Division of Consumer Counsel, Office of the Attorney General, 219 Va. 1072, 254 S.E.2d 102 (1979). In the instant case, the Commission had before it sufficient evidence upon which to reject the Company's request for a weather normalization adjustment. Hence, its refusal to adopt weather normalization was neither arbitrary nor capricious. The judgment of the district court on the issue of weather normalization is therefore affirmed.

Decree
For the reasons assigned, the judgment of the district court is reversed insofar as it reverses the Commission's order on the issue of the inclusion of disallowed imprudent, unreasonable or excessive expenditures in the savings tracker calculation. The district court's judgment is affirmed as to those portions dealing with the rate of return on common equity and the requested weather normalization adjustment. The case is remanded to the Commission for further proceedings consistent with this opinion.
NOTES
[*] KNOLL, J., not on panel. See Rule IV, Part 2, Section 3.
[1] For a more in-depth explanation of the background facts leading up to this appeal, see this court's opinion in Entergy Gulf States, Inc. v. Louisiana Public Service Com'n, 98-1235 (La.4/16/99), 730 So.2d 890 (reviewing the Commission's order following the second annual review of the Company's earnings).
[2] The trial court also reversed the Commission's disallowance of certain cost savings expenditures and an error in the adjustment of non-Riverbend rate base to year-end levels. These issues, however, have not been appealed to this court.
[3] The Company also briefed and argued an additional issue dealing with the interest rate applicable to refunds, but this issue was resolved under a settlement agreement approved by the Commission on June 21, 2000 and ordered dismissed by this court pursuant to a joint motion to dismiss filed by the parties.
[4] The Order itself uses the following example to illustrate this point:

The Company agreed that a regulatory disallowance in a traditional rate-making case, where there are no savings tracker issues involved, would not allow a utility to recover any portion of the disallowed costs, whereas the Company's proposal would allow the Company to recover 60% of the disallowance as a result of the disallowance being reflected in the savings tracker. The following example was used at the hearing, by the use of a hypothetical: a company whose filings of $100 involves no savings tracker calculation and $10 of which is disallowed as an imprudent cost, would recover $90 in rates. However, due to the savings tracker issues in the present case, a Company such as EGSI, whose base year inflated figure is $100, and an imprudence based disallowance of $10, and the future year is $100, would have no savings in the tracker if the test year cost of $100 is included in the tracker, and the rates would be set at $90 as a result for the setting of rates for the future. However, if the imprudent expenditure of $10 is taken out of the future year in the tracker, a future year calculation would result, along with a savings calculation of $10, $6 of which the Company would be allowed to retain. Thus, a company with an imprudence disallowance of $10 would be allowed to recover $96 if the disallowance is reflected as a savings in the savings calculation in the tracker, whereas in the traditional ratemaking case or in a case with a savings tracker but where the disallowance is not reflected as a savings, the company would recover $90.
L.P.S.C. Order No. U-22092-B at 30-31.
[5] The Order states:

The weather adjustment may not be appropriate in annual earnings cases. Unlike adjustments for abnormal nonrecurring items, the adjustment may be unnecessary. Over eight years of annual reviews, it is likely that changes in weather will tend to cancel out.
The evidence suggests that the available weather data may not be reliable. EGSI contested data from the weather station used by the Staff witness; the Staff contested the data relied on by EGSI. The adjustment proposed by the administrative law judge combines part of each analysis; it was not supported in its entirety by either party. Additionally, data from at least two of the stations used in the analysis exhibits a hot bias that could prejudice the interests of ratepayers.
L.S.P.C. Order No. U-22092-B at 53.