I JOHNSON, Justice.*
Entergy Louisiana, Inc. (“ELI”) filed suit in the Nineteenth Judicial District Court for the Parish of East Baton Rouge seeking a stay or injunctive relief with respect to portions of Order No. U-20925G issued by the Louisiana Public Service Commission (“LPSC”). By its Order, the LPSC prohibited ELI from including generating units which are in Extended Reserve Shutdown status in the calculation of reserve equalization payments under Service Schedule MSS-1 of the Entergy Sys *29 tem Agreement. The LPSC further ordered ELI to credit the overpayments back to its customers. The district court upheld the Order, finding that the LPSC’s findings were neither arbitrary nor capricious and that the entity had acted within its constitutional and statutory authority. ELI appealed that judgment pursuant to La. Const. Art. IV, |2§ 21(E).[1] The sole issue presented for review is whether the LPSC is federally preempted from assessing the prudence of ELI’s decision in continuing to include the ERS units in its MSS-1 calculations. After a thorough review of the record, briefs, and relevant authorities, we hold that the LPSC is not precluded from assessing the prudence of ELI’s actions and that the LPSC’s ruling was not arbitrary or capricious or clearly erroneous. Accordingly, we affirm the LPSC’s ruling.
FACTS AND PROCEDURAL HISTORY

Background

The LPSC is an independent regulatory agency created by the Louisiana Constitution. It exercises regulatory authority over most retail electric rates and charges in Louisiana. Pursuant to La. Const. Art. IV, § 21, the LPSC has the power to regulate common carriers and public utilities in the State of Louisiana. LSA-R.S. 45:1168 provides in pertinent part:
A. The Commission shall exercise all necessary power and authority over any street railway, gas, electric fight, heat power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities.
The Federal Energy Regulatory Commission (“FERC”) is an independent regulatory agency within the United States Department of Energy which regulates, inter alia, the transmission and sale of electric energy at wholesale in interstate commerce. See 16 U.S.C.A. § 824 et seq.; 42 U.S.C.A. §§ 7101 et seq. The Federal Power Act defines “sale of electric energy at wholesale in interstate commerce” as the |3“sale of electric energy to any person for resale.” 16 U.S.C.A. § 824(d). However, the Federal Power Act limits federal regulation of electric utilities engaged in interstate commerce “to those matters which are not subject to regulation by the States.” 16 U.S.C.A. § 824(a).
ELI is an electric public utility wholly owned by Entergy Corporation, which also owns four other operating companies: En-tergy Arkansas, Inc:, Entergy Gulf States, Inc., Entergy Mississippi, Inc., and Enter-gy New Orleans, Inc. ELI operates in forty-three Louisiana parishes. The five operating companies plan, construct, and operate their collective electric generating and transmission facilities as a single, integrated system serving parts of Louisiana, Arkansas, Mississippi, and Texas. The costs and benefits of the coordinated operation of this interstate system are distributed among the operating companies pursuant to a rate schedule known as the Entergy System Agreement (“System Agreement”).[2] The System Agreement *30 governs many of the transactions among the operating companies, and its general purpose is set forth in Article III of the Agreement, which states:
The purpose of this Agreement is to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission and other facilities of the [Operating] Companies in such a manner as to achieve economies consistent with the highest practicable reliability of service, subject to financial considerations, reasonable utilization of natural resources and minimization of the effect on the environment. This Agreement also provides a basis for equalizing among the companies any imbalance of costs associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all the [Operating] Companies.
The System Agreement is a tariff approved by the FERC, and any revisions or |4amendments to the Agreement/tariff must be approved by the FERC. The overall administration of the Agreement is carried out by the Entergy Operating Committee, pursuant to Section 2.06 of the System Agreement. The Agreement is a binding contract on all of the operating companies, and pursuant to Section 1.01, termination of participation in the Agreement by any of the companies requires ninety-six months (eight years) written notice to the other companies.
The System Agreement allows the operating companies, among other things, to enter into arrangements among themselves to exchange resources. For instance, if one company is unable to meet the energy requirements for its system, it may make arrangements with one of the other companies to use its facilities and/or energy supply. The arrangements for such exchanges must be in the form of a Service Schedule which becomes a part of the System Agreement subsequent to FERC approval.
Since the effective date of the System Agreement, various FERC-approved Service Schedules have been added, one of which is Schedule MSS-1 (“MSS-1”).[3] MSS-1 is set forth in Section 10 of the System Agreement and provides the mechanism for equalizing system reserves among the operating companies. Pursuant to MSS-1, each of the operating companies is responsible for a share of the total Entergy system capability. Each company’s share is equal to the ratio of that company’s contribution to the system’s yearly average peak load. Some of the companies provide more than their calculated share of the system’s capability, while others provide less than their calculated share. The companies providing less than their calculated share make deficiency payments to the companies providing more |sthan their share. For example, if one company has reserves (excess capacity), and the other four companies do not, the other four companies may use the reserves, but must make payments to the company for their use. The revenue received from the other four companies is credited against the company with the reserve’s payment to the system. Each of *31 the operating companies makes or receives payments based on whether its capacity exceeds, equals, or is less than the system capability for which it is responsible.
In order to be counted as part of a company’s capability for determining MSS-1 payments, a generating unit has to be “available” for use by the system. Pri- or to August 5, 1997, Section 10.02 of the System Agreement provided in relevant part:
A unit is considered available to the extent the capability can be demonstrated and (1) is under the control of the System Operator, or (2) is down for maintenance or nuclear refueling.
A unit is considered unavailable if, in the judgment of the Operating Committee, it is of insufficient value in supplying system loads because of (1) obsolescence, (2) physical condition, (3) reliability, (4) operating cost, (5) start-up time required, or (6) lack of due diligence in effecting repairs or nuclear refueling in the event of a scheduled or unscheduled outage.
Several years after the System Agreement was executed, the operating companies had excess generating capacity. The companies conceived the Extended Reserve Shutdown (ERS) program, which allows the companies to save money (for the customers, as well as for the companies themselves) by placing the excess generating units in an inactive, ie. extended reserve status. Rather than disposing of units not in use, the companies kept twenty-four units on standby to have the power capacity for the future, in the event there was an increase in power demand. By placing the units in extended reserve status, the companies were able to reduce | fioperating staff and maintenance costs and defer costs of repairing the units.[4] The ERS units were not available to serve customers and, therefore, did not meet the definition of “available” in the System Agreement because they were not “down for maintenance or nuclear refueling” as required by the Agreement. Nonetheless, Entergy included the ERS units for purposes of calculating the Entergy operating companies’ capability under MSS-1. This treatment of the inactive units resulted in ELI making higher MSS-1 payments than it would have had if the units had not been included in the computation. These costs were passed on to ELI customers in the form of higher retail electricity rates.

The Proceedings Before the FERC

In 1993, Gulf States Utilities Company (“Gulf States”) merged with Entergy Corporation, and Entergy sought to amend the System Agreement to add Gulf States as an operating company subsidiary. In connection with the events surrounding the merger, the FERC reviewed the System Agreement and, thereafter, initiated proceedings to determine whether Enter-gy had violated the Agreement by including the ERS units in its MSS-1 calculations. The LPSC intervened in the FERC proceeding, alleging that Entergy violated the System Agreement by counting the ERS units as available capacity. To remedy the alleged violation, the LPSC sought retroactive refunds for Entergy’s Louisiana customers, plus interest.
Following an evidentiary hearing, a FERC administrative law judge concluded that (1) the language of the System Agreement permits Entergy to include generating units in MSS-1 calculations only to the extent that such units are “available;” (2) Entergy’s ERS units are not “available” under Schedule MSS-1; and (3) the inclusion of ERS units in MSS-1 calculations is *32 a violation of the System Agreement. Entergy Services, Inc. and Gulf States Utility Company, Initial Decision, 70 FERC ¶ 63,018, 1995 WL 85464 (March 3, 1995).
The FERC affirmed the administrative law judge’s determination, stating that En-tergy does not have “broad, unfettered discretion to decide which units should be eligible for inclusion in Schedule MSS-1 computation.” Entergy Services, Inc. and Gulf States Utilities Company, Opinion No. 415, 80 FERC ¶ 61,197 at p. 61,786, 1997 WL 438886 (August 5, 1997). However, the FERC declined to order a refund of overpayments made as a result of the violation, stating:
By including ERS units in the Schedule MSS-1 computation, Entergy continued the previously-approved equalization approach that was established for excess capacity on the Entergy System. Moreover, if Entergy had not undertaken to reduce costs for its system by implementing the ERS program, these units would have been eligible for inclusion in Schedule MSS-1. We do not believe that the Operating Companies should lose the right to have their costs equalized when they take advantage of the ERS program, which, we note, provides very significant benefits for the Entergy system.
* * *
By exercising our discretion not to order refunds, we are simply acting consistent with the equities in this case. Indeed, the record evidence demonstrates that, although Entergy acted in a manner inconsistent with Schedule MSS-1, the end result was just, reasonable, and not unduly discriminatory.
Id. at p. 61,788,1997 WL 438886. Instead, the FERC approved a proposed amendment to Section 10.02 of the System Agreement, effective August 5,1997, which allows the ERS units to be considered “available” under certain instances. The amendment provides, in pertinent part:
A unit is considered available to the extent the capability can be demonstrated and (1) is under the control of the System Operator, or (2) is down for maintenance or nuclear refueling, or (S) is in extended reserve shutdown (ERS) with the intent of returning the unit to service at a future date in order to meet Entergy System requirements. The Operating \ ^Committee’s decision to consider an ERS unit to be available to meet future System requirements shall be evidenced in the minutes of the Operating Committee and shall be based on consideration of current and future resource needs, the projected length of time the unit would be in ERS status, the projected cost of maintaining such unit, and the projected cost of returning the unit to service.
The FERC rejected the LPSC’s contention that the language of the amendment is ambiguous and does not limit Entergy’s judgment to make decisions on ERS units. The FERC concluded that the amendment serves to rectify the prior Section 10.02’s failure to expressly encompass the ERS program. The FERC subsequently denied the LPSC’s request for rehearing. Entergy Services, Inc. and Gulf States Utilities Company, FERC Order No. 415-A, 1998 WL 38137 (February 3, 1998).

The Proceedings Before the LPSC

Each year, ELI files with the LPSC certain financial data for the prior year, calculating its cost of services. The LPSC uses the data to determine ELI’s future retail rates. When ELI made its rate filing in 1997 for the 1996 test year, it included all of the generating units in ERS status. The LPSC’s Special Counsel objected, contending: (1) the overpayments resulting from the inclusion of units in *33 ERS status in MSS-1 should be removed from the 1996 test year operating expenses because they were made in violation of the FERC tariff; and (2) ELI’s continued use of ERS units in the MSS-1 calculation violates the amended Section 10.02 of the System Agreement because there is no evidence that Entergy has any “plan” for returning these units to service. Therefore, Special Counsel contended, such overpayments should not be recovered from Louisiana ratepayers. After considering the record, the LPSC ordered ELI to remove from its calculations “all MSS-1 overpayments incurred on or after August 6, 1997.” L.P.S.C. Order No. U-20925-G at p. 25. The LPSC further ordered ELI to credit the overpayments “back to ratepayers.” Id.
The LPSC found, inter alia, that Enter-gy’s treatment of the ERS units benefits' 19companies such as Arkansas Power & Light, while resulting in increased MSS-1 payment obligations to companies such as ELI and Mississippi Power & Light. The LPSC concluded that there exists no FERC order or other federal regulation that makes it mandatory for ELI to treat ERS units as available after August 5, 1997. The LPSC also concluded that ELI was put on notice by the FERC order that the MSS-1 treatment of ERS units was in violation of the System Agreement, and it resulted in significantly higher MSS-1 payments by ELI to its sister companies. The LPSC further found that ELI did not consider the effect of increased MSS-1 payments on its retail rates in Louisiana when it decided to continue the MSS-1 treatment of ERS units after August 5, 1997, and the company failed to minimize its operating costs by continuing such treatment.
The LPSC stated that ELI’s duty to incur prudent costs and avoid imprudent costs includes the duty to follow the criteria set forth in the amended Section 10.02 in reaching a decision regarding the availability status of ERS units after August 5, 1997. The LPSC found that when the Operating Committee made that decision, it did not have complete or accurate information before it regarding the costs of returning ERS units back to service, nor did the Operating Committee make necessary efforts to ascertain its “current and future resource needs, the projected length of time the unit would be in ERS status, the projected cost of maintaining such unit, and the projected cost of returning the unit to service,” all as required by amended Section 10.02. In particular, the LPSC relied upon testimony given by Kenneth Turner, Secretary of the Operating Committee and Director of Resource Planning for Entergy Services, Inc.[5] According to LPSC’s findings of fact, in a September 1997 presentation to the Operating Committee, Turner distributed a single sheet of paper showing the | inestimated cost of return to service of the ERS units including capital investment and five-year operation and maintenance costs on a net-present-value basis. The LPSC found that neither Turner nor his staff prepared any analyses of what it would cost to return the ERS units to service, and, at the time the Operating Committee decided to classify the units as available, Turner had not seen any analyses or studies concerning what it would cost to return the ERS units to service. Turner acknowledged that a later conducted Raytheon study[6] was *34 more detailed and reflected better estimates of the cost of returning the ERS units ,to service, and that in several instances the cost estimates contained in the Raytheon study were more than twice as high as the estimates Turner provided to the Operating Committee. The LPSC further found that the Raytheon study was not available to the Operating Committee when it made the decision to classify the ERS units as available. Finally, the LPSC found that Turner’s testimony that he could not give “a day, a week, a month, or even a year for any of the 24[ERS] units ... [or] a definite date when any of these units ... will come out” indicates that there was no plan in place to return the units to service. Nevertheless, he asserted that these units would be needed in the “relative near term,” which he defined to mean “any time within the next 10 years.” Based on these aspects of Turner’s testimony, the LPSC concluded that the MSS-1 payments made subsequent to the August 5, 1997 FERC Order were known to ELI, or should have been known, to be unreasonable and imprudent at the time the expenses were incurred.
The LPSC concluded:
The increased MSS-1 payments resulting from the treatment of ERS units as available under Schedule MSS-1 in violation of a FERC tariff should be removed from the company’s calculation of its cost of service, but such disallowance should be prorated because FERC Order No. 415 imposed an obligation on ELI to make those payments Infor a part of the rate effective period (i.e,, up to August 5,1997).
L.P.S.C. Order No. U-20925-G at p. 25.
ELI filed a petition for judicial review of the LPSC Order on February 17, 1999.[7] After a hearing, the district court affirmed the Order, stating:
The Court has carefully reviewed this matter and is of the Opinion that the Public Service Commission was neither arbitrary nor capricious in its finding that Entergy could not pass on the ELI overpayment to Louisiana consumers; nor was such ruling preempted by Federal Law and was not based on impermissible data. On the contrary, it was well within its constitutional and statutory authority. Therefore, the Order of the Public Service Commission is upheld.
The district court also granted a preliminary injunction, enjoining implementation and enforcement of the Order, pending a final judgment by this court.
ELI appealed to this court, arguing that the LPSC’s actions were arbitrary and capricious and are barred by federal preemption and the doctrine of res judicata.
DISCUSSION
The law applicable to judicial review of orders of the LPSC is well-settled. This court has repeatedly stated:
Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record.
*35 Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 00-0336, p. 4 (La.9/1/00), 766 So.2d 521, 525, (citing Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 98-1235, p. 6 (La.4/16/99), 730 So.2d 890, 897; Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 98-0881, p. 4 (La.1/20/99), 726 So.2d 870, 874; Gulf States Util. Co. v. Louisiana Pub. Serv. Comm’n, 96-0345, p. 2 (La.7/2/96), 676 So.2d 571, 573; Central Louisiana Elec. Co. v. Louisiana Pub. Serv. Comm’n, 508 So.2d 1361, 1364 (La.1987)).
This court has further stated:
The Commission is an expert within its own specialized field and its interpretation and application of its own General Orders, as distinguished from legislative statutes and judicial decisions deserve great weight, because the Commission is in the best position to apply its own General Orders.
Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 00-0336, at p. 4, 766 So.2d at 526, (citing Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 98-1235 at p. 6, 730 So.2d at 897, citing Dixie Elec. Membership Corp. v. Louisiana Pub. Serv. Comm’n, 441 So.2d 1208, 1210 (La.1983)). In sum, “courts must affirm the Commission’s rulings unless they are arbitrary or capricious, an abuse of authority, unsupported by the record, or clearly erroneous.” Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 00-0336, at p. 4, 766 So.2d at 526, (quoting Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 98-1235 at p. 6, 730 So.2d at 897).
The first issue presented for our review is whether the LPSC exceeded its authority when it reviewed ELI’s actions regarding including the ERS units in its calculations for MSS-1 payments. In essence, ELI contends that because the issue of violation of or compliance with the System Agreement, a FERC tariff, is peculiarly within the FERC’s purview, the LPSC is barred from determining whether the terms of the Agreement have been met. Conversely, the LPSC contends that its actions is not preempted by federal law because its Order is not in conflict with any federal law.
Was the LPSC Order Barred by Federal Preemption?
In determining whether a state regulation conflicts with the FERC’s authority, | ^courts have looked to the “filed rate doctrine,” which was created by the United States Supreme Court in Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The doctrine states that interstate power rates filed with or fixed by the FERC must be given binding effect by state utility commissions when determining intrastate rates. Montana-Dakota Utilities Co., 341 U.S. at 251-52, 71 S.Ct. at 695, 95 L.Ed. at 919. (Emphasis added). In Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966, 106 S.Ct. 2349, 2357, 90 L.Ed.2d 943, 954 (1986), the Supreme Court explained the filed rate doctrine, stating:
FERC clearly has exclusive jurisdiction over the rates to be charged ... interstate wholesale customers. (Citations omitted). Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress’ desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority.
In this case, the LPSC recognized that the “FERC has exclusive jurisdiction over the issue of whether the System Agreement has been violated.” L.P.S.C. *36 Order No. U-20925-G at 20. Accordingly, the LPSC found that it lacks authority to review the reasonableness of ELI’s 1996 MSS-1 overpayments or to order refunds of the same, contrary to the FERC’s express refusal to order refunds. However, the LPSC noted that the FERC order did not consider whether the Operating Committee’s decision to use the ERS units in its calculations after August 5, 1997 is in compliance with the System Agreement. Thus, the LPSC concluded that it has “the authority to assess the prudence of ELI’s decision to continue to accord MSS-1 treatment to ERS units subsequent to FERC Order No. 415 dated August 5, 1997.” Id.
The LPSC based its determination upon an “exception” to the filed rate doctrine set forth in Pike County Light & Power Co. v. Pennsylvania Public Utility Comm’n, 77 Pa.Cmwlth. 268, 465 A.2d 785, 738 (1983). In that case, Pike County Light & Power Company 1 u(“Pike”) was a subsidiary of Orange and Rockland Utilities, Inc., a New York State operating utility. Pike’s power supply was provided by the parent company through a FERC-approved Power Supply Agreement. Pursuant to an investigation of a proposed supplement to the Agreement/tariff, an administrative law judge concluded that Pike’s reliance on the parent company as a source of power represented an abuse of management discretion in consideration of available, alternative, more economical, supplies of electricity. Accordingly, the administrative law judge submitted a recommendation to the Pennsylvania Public Utility Commission reducing Pike’s purchased power expense, which resulted in a revenue increase in an amount less than the amount sought in the proposed tariff supplement. The Public Utility Commission adopted the administrative law judge’s findings and conclusions, and Pike appealed, arguing that the Public Utility Commission order was barred by federal preemption.
The Pennsylvania court held that, in setting retail rates, a state commission retains power to consider and reject the “wisdom” of a utility company’s contract to purchase interstate power at wholesale, even in situations in which the FERC, in setting the wholesale rate, has already found the terms of the interstate arrangement just and reasonable. The court reasoned that while the FERC has exclusive statutory jurisdiction to set just and reasonable rates, a determination of the prudence of the utility company’s decision to purchase power from a particular source is not exclusively within the FERC’s jurisdiction. Therefore, the court concluded, the filed rate doctrine does not limit the jurisdictional and regulatory authority of a state commission to review a utility’s decision to purchase power at a higher (albeit FERC-approved) price, where there are alternative sources of power at a lower price than the FERC-approved price. The court stated:
The FERC does not analyze [the subsidiary utility company’s] cost of service data or purchased power alternatives in making its determination. The FERC |1Bfocuses on [the parent utility company] to determine whether it is just and reasonable for that company to charge a particular rate, but makes no determination of whether it is just and reasonable for [the subsidiary] to incur such a rate as an expense. The [Public Utility Commission], on the other hand, has no jurisdiction to analyze [the parent company’s] cost of service data and makes no determination as to the reasonableness for [the parent company] to charge its rates. The [Public Utility Commission] focuses on [the subsidiary] and its cost of service data to determine whether it is reasonable for Pike to incur such *37 costs in light of available alternatives. So while the FERC determines whether it is against pubhc interest for [the parent company] to charge a particular rate in hght of its costs, the [Pubhc Utility Commission] determines whether it is against the pubhc interest for [the subsidiary] to pay a particular price in hght of its alternatives. The regulatory functions of the FERC and the [Pubhc Utility Commission] thus do not overlap, and there is nothing in the federal legislation which preempts the [Pubhc Utility Commission’s] authority to determine the reasonableness of a utility company’s claimed expenses. In fact, we read the Federal Power Act to expressly preserve that important state authority.
Id. at 738.
Moreover, in New Orleans Public Service, Inc. v. The Council of the City of New Orleans, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the New Orleans Public Service, Inc. (“NOPSI”), along with three other operating companies, was a wholly owned subsidiary of a parent company, Middle South Utilities. Each of the operating companies agreed to finance the construction of a new nuclear power plant. Subsequently, a controversy arose over the percentage of each company’s share of the construction costs. After a review, the FERC held the NOPSI hable for 17 percent of the costs. NOPSI then apphed to the New Orleans City Council, the local ratemaking authority, for retail rate increases designed to pass on to retail customers NOPSI’s share of the cost of the nuclear plant. The City Council entered an Order, disallowing some of the rate increase, asserting that NOPSI had negligently incurred the costs. NOPSI sought injunctions in federal and state court to prevent the City |1fiCouncil’s Order from taking effect, arguing that the City Council’s Order was preempted by federal law.
The federal district court and court of appeal abstained from entertaining the federal injunction, finding that the existence of a state court suit on the same issue required federal abstention. The United States Supreme Court reversed, holding that federal abstention was not required. Although the Court did not address the issue of whether NOPSI’s actions subsequent to the FERC order violated the filed rate doctrine, it remanded the case, stating:
The Council has not sought directly to regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI’s agreement to participate in [the construction of the power plant] in the first place. Rather, the Council maintains that it has examined the prudence of NOPSI’s failure, after the risks of nuclear power became apparent, to diversify its supply portfolio, and that finding that failure negligent, it has taken the normal ratemaking step of making NOPSI’s shareholders rather than the ratepayers bear the consequences. Nothing in this is directly or even indirectly foreclosed by the federal statute, the regulations implementing it, or the case law applying it.
491 U.S. at 367, 109 S.Ct. at 2517-18, 105 L.Ed.2d at 316.
On remand, the federal district court held that the City Council’s Order was not “facially” preempted by federal law.[8] The *38 federal Fifth Circuit Court of Appeal l17afSrmed, agreeing that the City Council’s Order was not preempted by the FERC’s Order. The appellate court reasoned that the City Council did not challenge the validity of the FERC’s allocation, but merely imposed the consequences of NOPSI’s failure to diversify its supply portfolio on NOPSI, rather than on its customers. New Orleans Public Service, Inc. v. The Council of the City of New Orleans, 911 F.2d 993 (5th Cir.1990).
In the case sub judice, like the New Orleans City Council, the LPSC is not attempting to regulate interstate wholesale rates. Nor has the LPSC challenged the validity of the FERC’s declination to order refunds of amounts paid in violation of the System Agreement prior to the amendment. Additionally, the LPSC has not challenged ELI’s decision to participate in the Agreement. Rather, the LPSC has merely examined the prudence of ELI’s failure to make steps to minimize its MSS-1 payments after the effective date of the amendment to Section 10.02 of the System Agreement. There is nothing in the federal statutes or case law that prohibits the LPSC from assessing the prudence of ELI’s actions.
Furthermore, the FERC’s determination encompassed treatment of the ERS units prior to the effective date of the amendment. The FERC refused to order refunds and approved the amendment to Section 10.02 of the System Agreement. The FERC never ruled on the issue of whether ELI’s decision to continue to include the ERS units is a prudent one. Nor did the FERC determine whether ELI must continue to make overpayments to the other Entergy operating companies. Also, the FERC did not make it mandatory for the companies to include the ERS units in its MSS-1 calculations. For these reasons, we hold that the LPSC is not precluded from assessing the prudence of ELI’s decision to continue to include the ERS units in its calculations for MSS-1 payments.
Was the LPSC Order Arbitrary or Capricious or Clearly Erroneous?
11RELI further contends that the LPSC’s actions were arbitrary and capricious. As stated above, a reviewing court may reverse the LPSC’s ruling if it finds that the Commission’s ruling was arbitrary or capricious or clearly erroneous. See Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 00-0336 (La.9/1/00), 766 So.2d 521; Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm’n, 98-1235 (La.4/16/99), 730 So.2d 890.
As the LPSC pointed out, ELI had two options: (1) continuing to treat the ERS units as available upon meeting the criteria set forth in the amended Section 10.02; or (2) treating the units as unavailable. ELI elected to continue to include the ERS units and pass on the increased costs to its customers in the form of higher retail rates. The LPSC concluded that ELI acted imprudently and determined that ELI, not Louisiana rate payers, should bear the consequences of its decision.
Additionally, the LPSC found that En-tergy’s Operating Committee did not “ex *39 ert due diligence in ascertaining the costs and benefits of bringing the ERS units back to service” when it made the decision regarding the availability of the ERS units. The record supports that conclusion. As the LPSC noted, the information that Turner presented to the Operating Committee contained no analysis of the costs and benefits of returning the units to service. Furthermore, the record indicates that no efforts were made to determine when or if the units would be needed. The record is devoid of any attempt by ELI to minimize its costs. Accordingly, we find that the LPSC’s finding that ELI acted imprudently by failing to minimize its costs was not arbitrary or capricious and was supported by the evidence.
CONCLUSION
For the reasons set forth above, we hold that the LPSC is not precluded from assessing the prudence of ELI’s decision to continue to include the ERS units in its calculations for MSS-1 payments. We further hold that the LPSC’s determination that |19ELI acted imprudently is supported by the record and is not arbitrary or capricious.
AFFIRMED.
LOBRANO and TRAYLOR, JJ., dissents.
KIMBALL, J., dissents and assigns reasons.

 Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.

. La. Const. Art. IV, § 21(E) provides in pertinent part:
Appeal may be taken in the manner provided by law by any aggrieved party or interve-nor to the district court of the domicile of the commission. A right of direct appeal from any judgment of the district court shall be allowed to the supreme court. These rights of appeal shall extend to any action by the commission, including but not limited to action taken by the commission or by a public utility....

. The System Agreement was initially entered into on April 23, 1982. At that time, the operating companies included Arkansas Pow *30 er & Light Company, Gulf States Utilities Company, Louisiana Power & Light Company, Mississippi Power & Light Company, New Orleans Public Service Inc., and Entergy Services, Inc. The Agreement became effective August 1, 1982.

. The “MSS” moniker refers to Middle South Services. In the late 1980s, Middle South Services changed its name to Entergy, and MSS is merely a “holdover” from the old company name. The number “1” indicates that it was the first Service Schedule to be added as an ancillary to the System Agreement.

. By 1999, all of the ERS units, with the exception of one, had either been returned to active service, or was scheduled for return to service.

. Entergy Services, Inc. is the service company of Entergy Corporation which performs, among other activities, integrated planning for Entergy's Operating Companies.

. In August, 1997, at Entergy’s request, Ray-theon Engineers & Constructors, Inc. conducted a study estimating the cost of returning the ERS units to service.

. The LPSC order also adopted a "net proceeds” of debt methodology for determining ELI’s capital structure. However, that portion of the order is not before this court as it was not appealed to the district court.

. The federal district court stayed the federal action because the state court had entered judgment in the City Council’s favor. In the state court proceedings, the state' district court denied the injunction, finding that the *38 Order did not conflict with federal law. The state appellate court affirmed, stating:
The Council’s order on its face, does not violate any express law. In fact, as an administrative ruling, the order is itself akin to law. Moreover, the order specifically provides that it does not intend to affect wholesale ratemaking, which is preempted by federal law, or to undermine the FERC allocation of [the nuclear power plant] power and costs.
The court of appeal expressly declined to address the issue of whether the City Council’s Order was preempted by federal law, making it clear that it was deciding the issue of whether an injunction was appropriate.