# ENTERGY LOUISIANA, INC. *v.* LOUISIANA PUBLIC SERVICE COMMISSION ET AL.

No. 02–299.   Argued April 28, 2003—Decided June 2, 2003

Thomas, J., delivered the opinion for a unanimous Court.

*David W. Carpenter* argued the cause for petitioner. With him on the briefs were *Virginia A. Seitz, J. Wayne Anderson,* and *Kathryn Ann Washington.*

*Austin C. Schlick* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Deputy Solicitor General Kneedler, Cynthia A. Marlette,* and *Dennis Lane.*

*Michael R. Fontham* argued the cause for respondents. With him on the brief were *Paul L. Zimmering, Noel J. Darce, Dana M. Shelton,* and *Jason M. Bilbe.*\*

Justice Thomas delivered the opinion of the Court.

The Federal Energy Regulatory Commission (FERC) regulates the sale of electricity at wholesale in interstate commerce. 16 U. S. C. § 824(b). In this capacity, FERC must ensure that wholesale rates are "just and reasonable," § 824d(a). In *Nantahala Power & Light Co.* v. *Thornburg,* 476 U. S. 953 (1986), and *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore,* 487 U. S. 354 (1988) *(MP&L),* the Court concluded that, under the filed rate doctrine, FERC-approved cost allocations between affiliated energy compa-

---

\**Charles G. Cole, Edward H. Comer,* and *Barbara A. Hindin* filed a brief for Edison Electric Institute as *amicus curiae* urging reversal.

nies may not be subjected to reevaluation in state rate-making proceedings. We consider today whether a FERC tariff that delegates discretion to the regulated entity to determine the precise cost allocation similarly pre-empts an order that adjudges those costs imprudent.

## I

Petitioner Entergy Louisiana, Inc. (ELI), is one of five public utilities owned by Entergy Corporation (Entergy), a multistate holding company. ELI operates in the State of Louisiana and shares capacity with its corporate siblings operating in Arkansas, Mississippi, and Texas (collectively, the operating companies). This sharing arrangement allows each operating company to access additional capacity when demand exceeds the supply generated by that company alone. But keeping excess capacity available for use by all is a benefit shared by the operating companies, and the costs associated with this benefit must be allocated among them. State regulators establish the rates each operating company may charge in its retail sales, allowing each company to recover its costs and a reasonable rate of return. Thus, the cost allocation between operating companies is critical to the setting of retail rates.

Entergy allocates costs through the system agreement, a tariff approved by FERC under § 205 of the Federal Power Act (FPA), 41 Stat. 1063, 16 U. S. C. § 824d. The system agreement is administered by the Entergy operating committee, which includes one representative from each operating company and one from Entergy Services, a subsidiary of Entergy that provides administrative services to the system. Service Schedule MSS–1, which is included as § 10 of the system agreement, allows for cost equalization of shared capacity through a formula that dictates that those operating companies contributing less than their fair share, i. e., using more capacity than they contribute, make payments to the others

that contribute more than their fair share of capacity.[1] Those making such payments are known as "short" companies, and those accepting the payments are known as "long" companies. Each operating company's capability is determined monthly, and payments are made on a monthly basis— a long company receives a payment equal to its average cost of generating units multiplied by the number of megawatts the company is long. Because the variables that determine the MSS–1 cost allocation can change monthly, Service Schedule MSS–1 is an automatic adjustment clause under §205(f) of the FPA, 16 U. S. C. §824d(f),[2] which exempts it from the FPA's ordinary requirements for tariff changes.

In order to determine whether an operating company is long or short in a given month, one must know how much capacity that operating company is making available to its siblings. The question is not as easy as asking whether the generating facilities are on or off, however, because in the mid-1980's the operating committee initiated the Extended Reserve Shutdown (ERS) program. Responding to system-wide overcapacity, ERS allowed some generating units to be identified as not immediately necessary for capacity needs and effectively mothballed. However, these units could be activated if demand increased, meaning that the capacity they represented was not forever placed out of reach of the operating companies. As a result, ERS units were considered "available" for purposes of calculating MSS–1 cost equalization payments. Counting ERS units as available

---

[1] Where, as here, public utilities share capacity, the allocation of costs of maintaining capacity and generating power constitutes "the sale of electric energy at wholesale in interstate commerce." 16 U. S. C. §824(b)(1).

[2] Section 824d(f)(4) provides the definition of "automatic adjustment clause":

"a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate."

has generally had the effect of making ELI, already a short company, even more short, thus increasing its cost equalization payments.

In December 1993, FERC initiated a proceeding under §206 of the FPA, 16 U. S. C. §824e, to decide whether the system agreement permitted ERS units to be treated as available. Respondent Louisiana Public Service Commission (LPSC), which regulates ELI's retail rates in Louisiana, participated in the FERC proceeding and argued that customers of ELI were entitled to a refund as a result of MSS–1 overpayments made by ELI after the alleged misclassification of ERS units as available. FERC agreed that Entergy had violated the system agreement in its classification of ERS units as available, but determined that a refund was not supported by the equities because the resultant cost allocations, while violative of the tariff, were not unjust, unreasonable, or unduly discriminatory. *Entergy Servs., Inc.*, 80 FERC ¶ 61,197, pp. 61,786–61,788 (1997) (Order No. 415). FERC also approved, over the objection of the LPSC, an amendment to the system agreement that allows an ERS unit to be treated as available under MSS–1 if the operating committee determines it intends to return the unit to service at a future date.[3] The Court of Appeals for the District of

---

[3] Section 10.02 of the system agreement, as amended on August 5, 1997, pursuant to FERC Order No. 415 provides:

"A unit is considered available to the extent the capability can be demonstrated and (1) is under the control of the System Operator, or (2) is down for maintenance or nuclear refueling, or (3) is in extended reserve shutdown (ERS) with the intent of returning the unit to service at a future date in order to meet Entergy System requirements. The Operating Committee's decision to consider an ERS unit to be available to meet future System requirements shall be evidenced in the minutes of the Operating Committee and shall be based on consideration of current and future resource needs, the projected length of time the unit would be in ERS status, the projected cost of maintaining such unit, and the projected cost of returning the unit to service." 80 FERC, at 61,788–61,789 (emphasis deleted).

Columbia Circuit denied the LPSC's petition for review of FERC Order No. 415. *Louisiana Public Service Comm'n* v. *FERC*, 174 F. 3d 218 (1999). With respect to the amendment, the Court of Appeals found that "FERC understandably concluded that [it] set out the parameters of the operating committee's discretion, and that discriminatory implementation of the amendment could be remedied in a proceeding under FPA § 206." *Id.*, at 231.

ELI made its annual retail rate filing with the LPSC in May 1997. One of the contested issues was "whether payments under the System Agreement for the cost of generating units in Extended Reserve Shutdown should be included or excluded from ELI's revenue requirement." App. to Pet. for Cert. 25a. Given FERC's determination that the inclusion of ERS units as available prior to August 5, 1997 (the date FERC Order No. 415 issued), was just and reasonable, the LPSC confined its review to MSS–1 payments made after August 5, 1997. Its own staff argued before the LPSC that after August 5, 1997, ELI and the operating committee violated *amended* § 10.02(a) of the operating agreement by continuing to count ERS units as available. The LPSC concluded, however, that it was "pre-empted from determining whether the terms of a FERC tariff have been met, for the issue of violation of or compliance with a FERC tariff is peculiarly within FERC's purview." *Id.*, at 64a.

Nevertheless, the LPSC held that it was not pre-empted from disallowing MSS–1-related costs as imprudent subsequent to August 5, 1997:

> "[T]hough FERC has exclusive jurisdiction over the issue of whether the System Agreement has been violated, there currently exists no FERC order that has found that the Operating Committee's decision is in compliance with the System Agreement. In the absence of such FERC determination, this Commission can scrutinize the prudence of the Operating Committee's decision

without violating the [S]upremacy [C]lause insofar as that decision affects retail rates." *Id.*, at 65a.

The LPSC concluded that the operating committee's treatment of ERS units after August 5, 1997, was imprudent and that ELI's MSS–1 payments would not be considered when setting ELI's retail rates in Louisiana. In other words, though ELI made the MSS–1 payments to its "long" corporate siblings, it would not be allowed to recoup those costs in its retail rates.[4]

ELI petitioned for review of the LPSC's decision in State District Court. That petition was denied, and ELI appealed to the Supreme Court of Louisiana, which upheld the LPSC's decision. 2001–1725 (La. 4/3/02), 815 So. 2d 27. The Supreme Court of Louisiana held that the LPSC's order was not barred by federal pre-emption because the LPSC was not "attempting to regulate interstate wholesale rates" or "challeng[ing] the validity of the FERC's declination to order refunds of amounts paid in violation of the System Agreement prior to the amendment." *Id.*, at 38. Further, the court reasoned, "FERC never ruled on the issue of whether ELI's decision to continue to include the ERS units [after August 5, 1997, was] a prudent one" or made "it mandatory for the [operating committee] to include the ERS units in its MSS–1 calculations." *Ibid.*

We granted ELI's petition for writ of certiorari to address whether the Court's decisions in *Nantahala* and *MP&L* lead to federal pre-emption of the LPSC's order. 537 U. S. 1152 (2003). We hold that *Nantahala* and *MP&L* "res[t] on a foundation that is broad enough," *MP&L*, 487 U. S., at 369, to require pre-emption of the order in this case.

---

[4] The MSS–1 payments that were disallowed were, in fact, those made in 1996, which were to be used in calculating 1997–1998 retail rates by the LPSC. App. to Pet. for Cert. 76a.

## II

### A

The filed rate doctrine requires "that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Nantahala*, 476 U. S., at 962. When the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause. *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 581–582 (1981).

In *Nantahala* and *MP&L*, the Court applied the filed rate doctrine to hold that FERC-mandated cost allocations could not be second-guessed by state regulators. *Nantahala* involved two corporate siblings, Nantahala Power & Light Company and Tapoco, Inc., the former of which served retail customers in North Carolina. Both Nantahala and Tapoco provided power to the Tennessee Valley Authority (TVA), which in turn sold power back to them pursuant to an agreement between all three parties. But the power was not purchased at a uniform price. Low-cost power was made available to both Nantahala and Tapoco in consideration for the right to pour all of their power into the TVA grid. This low-cost power was apportioned 80% to Tapoco, which served exclusively the corporate parent of Tapoco and Nantahala, and 20% to Nantahala. Nantahala purchased the remainder of its power requirements at higher prices. FERC approved this cost allocation with a slight modification, so that Nantahala received 22.5% of the low-cost entitlement power. However, the North Carolina Supreme Court upheld the North Carolina Utilities Commission's (NCUC) determination that Nantahala's share of the low-cost power was properly 24.5%. This resulted in a lower cost computation for Nantahala, and therefore lower rates for North Carolina retail customers, than would have obtained if FERC's cost allocation had been respected by NCUC.

This Court held that the state cost allocation order was pre-empted:

> "Nantahala must under NCUC's order calculate its retail rates as if it received more entitlement power than it does under FERC's order, and as if it needed to procure less of the more expensive purchased power than under FERC's order. A portion of the costs incurred by Nantahala in procuring its power is therefore 'trapped.'" 476 U. S., at 971.

Trapping of costs "runs directly counter," *id.*, at 968, to the rationale for FERC approval of cost allocations, the Court concluded, because when costs under a FERC tariff are categorically excluded from consideration in retail rates, the regulated entity "cannot fully recover its costs of purchasing at the FERC-approved rate . . . ," *id.*, at 970.

In *MP&L*, the Court further defined the scope of filed rate doctrine pre-emption in the cost allocation context. Predecessors of the operating companies concerned here were jointly involved in the construction of the Grand Gulf nuclear power plant in Mississippi. The costs of the project turned out to be significantly higher than had been originally planned, and as a result the wholesale cost of power generated at Grand Gulf was much higher than power available from other system generating units. But the high fixed costs of building Grand Gulf had to be recouped, and the operating companies agreed that each of them would purchase a specific proportion of the high-cost power generated at Grand Gulf. The original allocation was challenged before FERC, which ultimately approved a modified tariff. That tariff required Mississippi Power and Light (MP&L, now Entergy Mississippi) to purchase 33% of the power produced at Grand Gulf.

Mississippi regulators allowed MP&L to pass along these costs to consumers through retail rate increases. The Mississippi Supreme Court, however, reasoned that "FERC's de-

termination that MP&L's assumption of a 33% share of the costs associated with Grand Gulf would be fair to its sister operating companies did not obligate the State to approve a pass-through of those costs to state consumers without a prudence review." *MP&L,* 487 U. S., at 367. The Mississippi Supreme Court distinguished *Nantahala* by limiting the scope of its holding to "matters *actually determined,* whether expressly or impliedly, by the FERC." *Mississippi ex rel. Pittman* v. *Mississippi Public Service Comm'n,* 506 So. 2d 978, 986 (Miss. 1987) (citation omitted).

This Court disagreed, holding that the state court "erred in adopting the view that the pre-emptive effect of FERC jurisdiction turned on whether a particular matter was actually determined in the FERC proceedings." *MP&L,* 487 U. S., at 374. Although FERC had not explicitly held that the construction of Grand Gulf was prudent, the cost allocation filed with FERC pre-empted any state prudence review, because "if the integrity of FERC regulation is to be preserved, it obviously cannot be unreasonable for MP&L to procure the particular quantity of high-priced Grand Gulf power that FERC has ordered it to pay for." *Ibid.*

### B

Applying *Nantahala* and *MP&L* to the facts of this case, we conclude that the LPSC's order impermissibly "traps" costs that have been allocated in a FERC tariff. The amended system agreement differs from the tariffs in *MP&L* and *Nantahala* because it leaves the classification of ERS units to the discretion of the operating committee, whereas in *Nantahala* and *MP&L* the cost allocations were specific mandates. The Louisiana Supreme Court concluded that this delegated discretion provided room for the LPSC's finding of imprudence where a mandated cost allocation would not. However, Congress has specifically allowed for the use of automatic adjustment clauses in the FPA, and it is uncontested that the MSS–1 schedule constitutes such an

automatic adjustment clause. We see no reason to create an exception to the filed rate doctrine for tariffs of this type that would substantially limit FERC's flexibility in approving cost allocation arrangements.

The Louisiana Supreme Court's other basis for upholding the LPSC's order was that FERC had not specifically approved the MSS–1 cost allocation after August 5, 1997, when it issued Order No. 415. See 815 So. 2d, at 38 ("The FERC never ruled on the issue of whether ELI's decision to continue to include the ERS units is a prudent one"). In so holding, the Louisiana Supreme Court revived precisely the same erroneous reasoning that was advanced by the Mississippi Supreme Court in *MP&L*. There this Court noted that the "view that the pre-emptive effect of FERC jurisdiction turn[s] on whether a particular matter was actually determined in the FERC proceedings" has been "long rejected." *MP&L, supra*, at 374. It matters not whether FERC has spoken to the precise classification of ERS units, but only whether the FERC tariff dictates how and by whom that classification should be made. The amended system agreement clearly does so, and therefore the LPSC's second-guessing of the classification of ERS units is pre-empted.

Finally, we address respondents' contention that the inclusion of ERS units in MSS–1 calculations was a violation of the amended system agreement and that, consequently, the LPSC's order is shielded from federal pre-emption. Curiously, respondents advance this argument here despite the LPSC's own prior holding that it does not have jurisdiction to determine whether the system agreement was violated and the Louisiana Supreme Court's acceptance of that concession. See App. to Pet. for Cert. 64a; 815 So. 2d, at 35–36. ELI and the United States maintain that the LPSC was correct when it initially held that FERC has exclusive jurisdiction to determine whether a FERC tariff has been violated and that state regulatory agencies may not, consistent with the FPA, disallow costs based on their own assessment of

noncompliance with a FERC tariff. But the question before us is whether the LPSC's order is pre-empted under *Nantahala* and *MP&L,* and that order does not rest on a finding that the system agreement was violated. The LPSC's express statement that it had no jurisdiction to conclude that there had been a violation of the system agreement confirms this. Consequently, we have no occasion to address the question of the exclusivity of FERC's jurisdiction to determine whether and when a filed rate has been violated.

For the foregoing reasons, the judgment of the Louisiana Supreme Court is reversed.

*It is so ordered.*