# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1586
_____

Entergy Arkansas, LLC

*Plaintiff - Appellant*

v.

Doyle Webb, in his official capacity as Chairman of the Arkansas Public Service
Commission; Katie Anderson, in her official capacity as Commissioner of the
Arkansas Public Service Commission; Justin Tate, in his official capacity as
Commissioner of the Arkansas Public Service Commission

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: September 24, 2024
Filed: December 4, 2024
_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Entergy Arkansas, LLC appeals the dismissal of its complaint challenging
the lawfulness of an order of the Arkansas Public Service Commission ("APSC").
We affirm.

# I. Background

Entergy Arkansas is a public utility company that supplies power to wholesale and retail customers in Arkansas.[1]  Wholesale customers purchase electricity for resale, while retail ratepayers purchase electricity to use.  *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016).  Public utilities like Entergy Arkansas are regulated by both federal and state authorities.  The Federal Energy Regulatory Commission ("FERC") regulates all interstate wholesale transactions.  *See* 16 U.S.C. § 824.  State commissions like the APSC regulate retail and *intra*state wholesale transactions.  *See FERC*, 577 U.S. at 279.  Electric providers must receive FERC's approval before conducting wholesale transactions across state lines.  *See* 16 U.S.C. § 824d(c).  They must submit a schedule that includes all rates and charges, as well as all classifications, practices, regulations, and contracts relevant to the rates and charges.  *Id.*  This schedule, once approved, is the "filed rate" or "tariff" and represents a significant limitation on the states' exclusive jurisdiction over in-state and retail transactions.

At all relevant times, Entergy Arkansas belonged to the Entergy System ("System"), a group of power companies that operated in several southern states.  The System was governed by an operating agreement.  Though each member company owned its own power plants, under the System agreement, all plants were operated centrally as if by a single large utility.  Costs and revenues were allocated among the different member companies.  For example, the agreement provided for "bandwidth adjustment payments" to ensure that no member had annual costs of more than eleven percent above or below the System average.  System members whose costs were lower than the System average had to pay bandwidth adjustments to other System members to achieve rough equalization of costs.

This litigation arises out of a series of short-term "opportunity sales" that Entergy Arkansas made to third-party wholesale customers between 2000 and 2009.

---

[1]Retail customers are often referred to as "ratepayers."

In the late 1990s, after a series of settlement agreements and court orders, a portion of Entergy Arkansas's capacity was excluded from retail use and set aside to be exclusively sold to wholesale customers. In the early 2000s, Entergy Arkansas used this set-aside electricity to make short-term opportunity sales to various out-of-system wholesale customers.

In 2009, the Louisiana Public Service Commission filed a complaint with FERC, contending that Entergy Arkansas's accounting treatment of the opportunity sales violated the System operating agreement, thus shortchanging the other System members. FERC agreed that Entergy Arkansas had violated the agreement, though it noted that Entergy Arkansas appeared to have acted in good faith. *La. Pub. Serv. Comm'n*, 139 FERC ¶ 61240, ¶ 136 (2012) ("Opinion No. 521"). This resulted in Entergy Arkansas owing almost $81.7 million to the other System members. After years of litigation, FERC determined that because its ruling retroactively *increased* Entergy Arkansas's costs, it also retroactively *decreased* the bandwidth adjustment payments that Entergy Arkansas should have made to the other System members. *La. Pub. Serv. Comm'n*, 165 FERC ¶ 61022, ¶¶ 75-76 (2018) ("Opinion No. 565"). This resulted in overpayments of about $13.7 million. Including this bandwidth offset, Entergy Arkansas owed the other System members a net refund of approximately $68 million, plus another approximately $67 million in interest, for a total of approximately $135 million.

Notably, FERC did not decide how the refund costs should be allocated—that is, whether the costs should be borne by Entergy Arkansas's shareholders or passed on to its retail ratepayers—even after the APSC petitioned for rehearing and clarification on that very issue. *See La. Pub. Serv. Comm'n*, 161 FERC ¶ 61171 (2017) ("Opinion No. 548-A"). As FERC "frequently explained," its "only goal" was "to put the Operating Companies, not all ratepayers, in the position they would have been in had" Entergy Arkansas properly accounted for the opportunity sales. *Entergy Serv., Inc. v. FERC*, No. 17-1251, 2021 WL 3082798, at *11 (D.C. Cir. Jul. 13, 2021) (unpublished); Opinion No. 548-A at ¶ 11. "FERC never planned to

address how costs would be distributed between ratepayers and shareholders." *Entergy Serv.*, 2021 WL 3082798, at \*11.

The APSC appealed FERC's decision to the United States Court of Appeals for the District of Columbia, contending that FERC should have addressed the refund's cost allocation, and that its associated costs should have been placed on Entergy Arkansas and not passed on to its retail customers. *See id.* The court disagreed, finding that FERC had "reasonably explained why this issue fell outside the scope of the proceedings." *Id.* It pointed out that "[a]t argument, counsel for FERC specifically stated that FERC 'went out of its way not to say something that would be preemptive or preclude someone from making argument[s]' about that issue." *Id.* "FERC never decided that Entergy Arkansas's shareholders would receive the benefits of the damages offset while Entergy Arkansas's ratepayers would not. FERC merely declined to address how damages would be distributed between the two." *Id.*

In December 2018, Entergy Arkansas paid the other System members in full. In May 2019, it petitioned the APSC for permission to increase its retail rate to recover the $135 million net refund from its retail customers. The APSC denied this request and further ordered that Entergy Arkansas refund the $13.7 million bandwidth offset (plus interest) to its retail customers. The APSC reasoned that the original overpayments had been paid by Entergy Arkansas's retail customers and thus should be refunded to them.

Entergy Arkansas accordingly credited the bandwidth offset to its retail customers and then filed this lawsuit, arguing that the APSC's order was invalid because it violated the filed rate doctrine, the dormant Commerce Clause, and Arkansas law. After a three-day bench trial, the district court[2] upheld the APSC's

---

[2]The Honorable Brian S. Miller, United States District Court for the Eastern District of Arkansas.

order, finding that it did not violate Arkansas law and that neither the filed rate doctrine nor the dormant Commerce Clause applied.

## II. Discussion

On appeal, Entergy Arkansas challenges the district court's determination that neither the filed rate doctrine nor the dormant Commerce Clause applied.[3]  When reviewing bench trial judgments, we review "the court's factual findings for clear error and its legal conclusions de novo."  *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 688 F.3d 938, 941 (8th Cir. 2012).

## A. Filed Rate Doctrine

We first address Entergy Arkansas's contention that the district court erred when it concluded that the APSC's order did not violate the filed rate doctrine.  "The filed rate doctrine requires that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates."  *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003) (internal quotation marks omitted).  As "a matter of enforcing the Supremacy Clause," FERC's decisions have "pre-emptive force."  *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963, 968 (1986).  The filed rate doctrine ensures that states "give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates."  *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 373 (1988).  Thus, once FERC has approved an interstate rate schedule, states cannot "trap[]" costs by preventing electric providers "from recovering the costs of paying the FERC-approved rate."  *Nantahala*, 476 U.S. at 970.  Whether this "pre-emptive effect" applies does not "turn[] on whether a particular matter was actually determined in the FERC proceedings," "but only [on] whether the FERC tariff dictates how and by whom that classification should be made."  *See Entergy*

_____

[3]Entergy Arkansas does not appeal the district court's determination that the APSC's order did not violate Arkansas law.

*La.*, 539 U.S. at 50.  In other words: for the filed rate doctrine to apply, FERC need not have actually determined the result, but it does need to have decided how or by whom that result would be determined.

As the district court found, the System's operating agreement was "undisputed[ly]" a "filed rate."  Thus, first, Entergy Arkansas contends that the refund is a filed rate and should be treated as a filed rate.  It argues that the APSC violated the filed rate doctrine by forcing Entergy Arkansas to absorb the refund, thus "trapping costs."  Second, Entergy Arkansas contends that the district court erred when it upheld the APSC's order to credit the retail ratepayers for the bandwidth adjustment.  It argues that the bandwidth adjustment was "part of the same filed rate" and that "there is no basis to apply the filed rate doctrine to one part, but not a second part, of the same filed rate."  Because the bandwidth costs would not have decreased but for the increased opportunity sales costs, Entergy Arkansas contends that the bandwidth offset should simply reduce the refund and not be allocated separately.

First, we conclude that the filed rate doctrine does not apply because FERC made no preemptive decision regarding the refund's cost allocation.  Though FERC decided the amount of the refund and how it should be divided among members of the System, it declined to decide how the costs should be allocated.  Rather—even when the APSC asked it to decide the cost allocation—FERC explained that "[t]he setting of retail rates within the Entergy system is a matter for state commissions, and nothing in [this decision] prevents the Arkansas Commission from pursuing this issue about the flow through of adjustments for bandwidth reductions in an appropriate forum."  Opinion 548-A, 161 FERC ¶ 61171 at ¶ 11.  At argument before the D.C. Circuit, FERC explained that it "went out of its way not to say something that would be preemptive or preclude someone from making argument[s]" about the cost allocation.  *Entergy Serv.*, 2021 WL 3082798, at *11.  Rather than deciding in favor of either the shareholders or the ratepayers, "FERC merely declined to address how damages would be distributed between the two."  *Id.*  In short, FERC made no decision that even arguably could have preempted the APSC's order.

Second, we conclude that the allocation of the bandwidth adjustment was also not part of the filed rate. Though the filed rate doctrine does not require an "actual[] determin[ation]," FERC must at least "dictate[] how and by whom that classification should be made." *See Entergy La.*, 539 U.S. at 49-50. Here, neither FERC nor the filed rate decided how the cost of any part of the refund should be allocated—bandwidth adjustment or otherwise. But it did explain that this is "a matter for state commissions." Opinion 548-A, 161 FERC ¶ 61171 at ¶ 11. Therefore, as the state regulatory authority, the APSC retains its authority to regulate all retail and in-state wholesale rates. Entergy Arkansas's arguments to the contrary are irrelevant because they do not address this fundamental question. Thus, we conclude that the APSC's order does not violate the filed rate doctrine.

## B. Dormant Commerce Clause

We next address Entergy Arkansas's contention that the APSC's order violates the dormant Commerce Clause because it discriminates against and imposes a clearly excessive burden on interstate commerce. The dormant Commerce Clause prohibits the enforcement of state laws driven by economic protectionism. *Nat. Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). Under the dormant Commerce Clause, a law is subject to strict scrutiny if it "overtly discriminates" against interstate commerce—either facially or through "a discriminatory purpose or a discriminatory effect." *See LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020). It may also be struck down for imposing a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

We have before struck down an APSC order because it violated the dormant Commerce Clause. *See Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 406 (8th Cir. 1985). Middle South Energy (the Entergy System's predecessor) had received FERC's approval to make certain interstate electric contracts—contracts that the APSC sought to block. *Id.* Though the district court found for

Middle South as a matter of preemption, we affirmed because the APSC's order discriminated against interstate commerce—both in purpose and effect. *Id.* at 411. We found evidence of discriminatory purpose where the APSC's order expressed hopes of "circumvent[ing] or deflect[ing] the economic harm that looms over the State from the imminent prospect of being mandated by a federal agency to pay for a power generating plant." *Id.* at 412. Further, the APSC's order discriminated in effect by shifting Arkansas's share of costs onto citizens of Mississippi and Louisiana. *Id.* at 416-17.

Leaning on *Middle South*, Entergy Arkansas argues that the APSC's order violates the dormant Commerce Clause—both by overtly discriminating and by imposing a clearly excessive burden on interstate commerce. It first argues that the APSC's order discriminates against interstate commerce by shifting the burden of the refund from retail ratepayers to Entergy Arkansas's mostly out-of-state shareholders. It also points out that some of the high-cost energy used in the opportunity sales came from out of state. By preventing Entergy Arkansas from passing these costs onto retail ratepayers, it argues, the APSC's order discriminates against interstate commerce. In the alternative, Entergy Arkansas argues that the APSC's order impermissibly burdens interstate commerce because it "penalizes" Entergy Arkansas for making good-faith sales to out-of-state entities. This could deter future electric providers from entering regional pools and from providing wholesale electricity.

The district court correctly found that the APSC's order does not discriminate and is not an impermissible burden. Unlike in *Middle South*, the APSC's order is not economic protectionism. Rather, as the district court explained, the "APSC has the power to ensure that public utilities, including [Entergy Arkansas], can only recover costs that are reasonably necessary in providing utility service to ratepayers." Further, there is no indication that the APSC placed the burden on Entergy Arkansas and its shareholders because they are out-of-state. Unlike in *Middle South*, Entergy Arkansas has produced no evidence of overt discrimination. Moreover, we agree with the district court that negative effects on interstate

commerce are "largely speculative and not clearly excessive" burdens on interstate commerce.  Therefore, the APSC's order does not violate the dormant Commerce Clause.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____